**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
TALLAHASSEE DIVISION**

**JAMES DAVID PELKEY,**

      **Petitioner,**

**vs.**                            **Case No. 4:12cv397-LC/CAS**

**JULIE L. JONES, Secretary,
Florida Department of Corrections,[1]**

      **Respondent.**

_____/

## REPORT AND RECOMMENDATION TO DENY § 2254 PETITION

On August 9, 2012, Petitioner James David Pelkey, proceeding pro se, filed a

petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254, with attached exhibits.

Doc. 1.  On May 15, 2013, Respondent filed an answer.  Doc. 17.  Respondent also

filed exhibits.  Doc. 18.  Petitioner filed a reply on or about June 17, 2013.  Doc. 19.

Petitioner also filed an addendum and a second addendum to his reply.  Docs. 20 and

21.

---

[1]The Clerk of Court shall substitute Julie L. Jones as Secretary of the Florida Department of Corrections in place of Michael D. Crews.  Julie Jones became Secretary on January 5, 2015, and shall be automatically substituted pursuant to Federal Rule of Civil Procedure 25(d).

The matter was referred to the undersigned United States Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636 and Northern District of Florida Local Rule 72.2(B).  After careful consideration of all issues raised, the undersigned has determined that no evidentiary hearing is required for disposition of this matter.  *See* Rule 8(a), R. Gov. § 2254 Cases in U.S. Dist. Cts.  For the reasons stated herein, the pleadings and attachments before the Court show that Petitioner is not entitled to federal habeas relief, and the § 2254 petition should be denied.

## State Court Proceedings

By information filed November 30, 2007, in the Second Judicial Circuit, Leon County, in case number 2007-CF-3883, the State of Florida charged Petitioner James D. Pelkey with sexual battery upon a person twelve (12) years of age or older (victim H.C.), a second degree felony, in violation of section 794.011(5), Florida Statutes, in connection with events that took place on or about December 23, 2006.  Doc. 18 Ex. B.  On January 20, 2009, the State filed a notice of its intention to use similar fact evidence pursuant to section 90.404, Florida Statutes.  *Id.* Ex. C.  Pelkey filed an objection.  *Id.* Ex. D.  An evidentiary hearing took place on April 1, 2009, during which the victim and the collateral crime witness, P.B., testified.  *Id.* Ex. F.  The trial court ruled the evidence from P.B. admissible.  *Id.* at 37-38.

Pelkey proceeded to a jury trial on April 9, 2009.  *Id.* Ex. H (trial transcript).  The victim and P.B. testified at trial, as well as several other witnesses.  *Id.* at 2-3.  Pelkey testified in his defense.  *Id.* at 93-118.  The jury found Pelkey guilty as charged.  *Id.* at 176-77; *Id.* Ex. I.  The trial judge adjudicated Pelkey guilty and sentenced him to ten

(10) years in prison, followed by five (5) years of sex offender probation.  Doc. 18 Ex. H

at 186-89, Ex. J.

Pelkey appealed his judgment and sentence to the First District Court of Appeal

(DCA), assigned case number 1D09-2055.  Doc. 18 Exs. K, N.  Pelkey raised three

points on appeal:

> (1)  Because the defense maintained that no sexual contact whatsoever
> occurred, the trial court erred in admitting evidence of a sexual incident
> with a different person to refute the non-defense of inadvertent sexual
> contact.
>
> (2) The trial court erred in excluding defense evidence collaterally
> corroborating the defense theory that the victim mistook her reaction to
> nonsexual contact as a sexual violation.
>
> (3) Pelkey was entitled to discharge on an information filed more than 175
> days after he was arrested for a different crime based on substantially the
> same acts and arising from the same criminal episode.

*Id.* Ex. N at i.  The State filed an answer brief.  *Id.* Ex. O.  Pelkey filed a reply brief.  *Id.*

Ex. P.  The First DCA affirmed the case per curiam without a written opinion on August

27, 2010.  *Id.* Ex. Q; <u>Pelkey v. State</u>, 43 So. 3d 697 (Fla. 1st DCA 2010) (table).  The

mandate issued September 14, 2010.  Doc. 18 Ex. Q.

On December 20, 2010, Pelkey filed, through counsel, a motion for post-

conviction relief pursuant to Florida Rule of Criminal Procedure 3.850.  *Id.* Ex. R. On

March 7, 2011, the State filed a response.  *Id.* Ex. S.  Pelkey filed a reply. *Id.* Ex. T.  An

evidentiary hearing took place on May 6, 2011, during which the victim and Pelkey's trial

counsel testified.  *Id.* Ex. U.  At the conclusion of the hearing, the state post-conviction

trial court denied relief on all grounds, stating reasons on the record.  *Id.* Ex. U2.  The

court subsequently rendered a written final order on May 6, 2011.  *Id.* Ex. W.

Pelkey appealed the order denying the Rule 3.850 motion to the First DCA,

assigned case number 1D11-3045.  *Id.* Ex. X.  Pelkey's counsel filed an initial brief and

raised one point:

> In the trial of this case in which the ultimate issue of fact was whether the
> appellant had sexually assaulted the alleged victim, the appellant's trial
> counsel provided ineffective assistance of counsel that likely affected the
> outcome of the appellant's trial when the attorney failed to fully develop
> before the jury evidence that the alleged victim purchased and delivered to
> the appellant numerous personal gifts and also lavished upon the
> appellant written praise and thanks, all in the hours immediately following
> the alleged assault.

*Id.* Ex. Y at i.  The State filed an answer brief.  *Id.* Ex. Z.  Pelkey's counsel filed a reply

brief.  *Id.* Ex. AA.  The First DCA affirmed the case per curiam without a written opinion

on December 9, 2001, with the mandate issuing December 28, 2011.  *Id.* Ex. BB;

<u>Pelkey v. State</u>, 75 So. 3d 725 (Fla. 1st DCA 2011) (table).

As indicated above, on August 9, 2012, Pelkey filed a § 2254 petition in this

Court.  Doc. 1.  Pelkey raises ten grounds, most of which allege ineffective assistance

of counsel (IAC):

> (1) IAC – Defense counsel failed to produce exculpatory evidence;
> specifically, that the victim purchased golfing gift certificates for Pelkey
> within hours after the alleged assault.  Doc. 1 at 3-4.

> (2) IAC – Defense counsel failed to recall the victim to the stand to answer
> three questions submitted by the jury.  *Id.* at 4.

> (3) IAC – Defense counsel failed to investigate the victim and thus
> effectively failed to offer a defense.  *Id.* at 5.  Counsel's failure to
> investigation the victim and her allegations prejudiced Pelkey because

defense counsel was not able to cross-examine the victim about past allegations of sexual assault and/or rape.  *Id.*

(4) IAC – Defense counsel did not properly impeach the victim.  *Id.* Defense counsel did not ask the victim about trying to contact Pelkey by numerous phone calls, voice mails, and home visits, for up to ten (10) days after the alleged incident.  *Id.*  Counsel also failed to impeach the victim about the meaning or intent in giving Pelkey gift certificates purchased only hours after the alleged incident.  *Id.*  Further, a comparison of the police report, deposition, and trial testimony of the victim reveals "at least eight strong, impeachable contradictions that would highlight the falseness of her accusations."  *Id.*

(5) IAC – Defense counsel did not object to prosecutorial statements not supported by witnesses or evidence; specifically, during the prosecutor's direct examination of the victim, the prosecutor made a statement not supported by any witness testimony or any other evidence and this "inflamed the minds of the jurors, insinuating that, at some point, the defendant admitted his guilt in this matter."  *Id.* at 6.

(6) IAC – Defense counsel did not object to inflammatory remarks made by the prosecutor in closing arguments.  *Id.* at 6-7.

(7) IAC – Defense counsel failed to admit at the post-conviction evidentiary hearing that counsel knew Pelkey's ex-wife and had discussed particulars of the case with her without Pelkey's permission.  *Id.* at 7.

(8) IAC – Defense counsel refused to offer expert testimony in Advanced Sports Massage Therapy and thus left the jury to accept the State's expert testimony.  *Id.* at 8.

(9) IAC – Defense counsel did not object to the State's witness, Pamela Bowles, who had noting to do with Pelkey's case, and the trial court erred in allowing collateral crime testimony on a fact not in issue.  *Id.* at 8-9.

(10) Trial Court Error – The state trial court erred by striking defense witnesses and preventing them from testifying.  *Id.* at 9.

Respondent has filed an answer with exhibits.  Docs. 17 and 18.  Petitioner has filed a

reply, as well as an addendum and a second addendum to his reply.  Docs. 19, 20, and

21.

## Analysis

Pursuant to 28 U.S.C. § 2254, as amended by the Anti-Terrorism and Effective Death Penalty Act of 1996 (AEDPA), federal courts may grant habeas corpus relief for persons in state custody.  Section 2254(d) provides, in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim –
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d).  *See* Williams v. Taylor, 529 U.S. 362 (2000); Gill v. Mecusker, 633 F.3d 1272 (11th Cir. 2011).

If a state prisoner's habeas petition "includes a claim that has been 'adjudicated on the merits in State court proceedings,' § 2254(d), an additional restriction applies." Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011).  The federal court may not grant relief unless the state court's adjudication of the claim:  (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  28 U.S.C. § 2254(d).   "This is a 'difficult to meet' and 'highly deferential standard for evaluating state-court rulings, which

demands that state-court decisions be given the benefit of the doubt.'" Cullen, 131 S.Ct. at 1398 (quoting Harrington v. Richter, 131 S.Ct. 770, 786 (2011), and Woodford v. Visciotti, 537 U.S. 19, 24 (2002)).  This Court's review "is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen, 131 S.Ct. at 1388.

Relevant here, in Strickland v. Washington, the U.S. Supreme Court adopted a two-part test for IAC claims:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.  To demonstrate ineffectiveness, a "defendant must show that counsel's performance fell below an objective standard of reasonableness." *Id.* at 688. To demonstrate prejudice, a defendant "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*  For this Court's purposes, importantly, "[t]he question 'is not whether a federal court believes the state court's determination' under the Strickland standard 'was incorrect but whether that determination was unreasonable – a substantially higher threshold.'" Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (quoting Schiro v. Landrigan, 550 U.S. 465, 473 (2007)).  "And, because the Strickland standard is a general standard, a state court has even more latitude to reasonably

determine that a defendant has not satisfied that standard." *Id.* It is a "doubly deferential judicial review that applies to a <u>Strickland</u> claim evaluated under the § 2254(d)(1) standard." *Id.*

### <u>Ground 1</u>: IAC – Exculpatory Evidence

In his first ground, Petitioner Pelkey asserts his trial counsel rendered ineffective assistance by failing to produce exculpatory evidence, specifically gift certificates purchased by the victim within hours after the alleged assault. Doc. 1 at 3-4. As Respondent indicates, in his Rule 3.850 motion, Pelkey asserted this argument within his claim attacking defense counsel's trial strategy. Doc. 17 at 13; *see* Doc. 18 Ex. R at 9-11. At the conclusion of the evidentiary hearing, the state post-conviction trial court discussed <u>Strickland</u> and denied the claim, making the following pertinent findings on the record:

> The cards were testified to during the trial. They were testified to without dispute. Putting them in evidence, in my estimation, would not have significantly changed the case. I do not find that Mr. Ward's conduct was deficient for making a strategy decision that he would not emphasize the cards, that he would not emphasize the visits after the fact. I don't find that to be ineffective assistance of counsel.
>
> . . . .
>
> I do accept Mr. Ward's testimony that emphasizing the cards could conceivably detract from the theory that they had for their case that he arrived at with Mr. Pelkey. I also find that it was – had the potential to conflict with or emphasize the Williams Rule testimony since there would be no explanation of a similar nature given as to Ms. B. testimony, the Williams Rule evidence.

Doc. 18 Ex. U2 at 69. In the written order, the state court denied post-conviction relief "[b]ased on the reasons as announced on the record," and finding "defendant has failed

to show that he received ineffective assistance of counsel or that he was prejudiced by the alleged deficiency." *Id.* Ex. W.  On appeal, the First DCA per curiam affirmed the case without an opinion.  *Id.* Ex. BB.  These rulings are entitled to AEDPA deference and review is limited to the record before the state court.  *See* 28 U.S.C. § 2254(d); Cullen, 131 S. Ct. at 1402; Richter, 131 S. Ct. at 784-85; Wright v. Sec'y of Dep't of Corr., 278 F.3d 1245, 1255 (11th Cir. 2002).

The record supports the factual findings of the state post-conviction trial court.  In particular, during the hearing on the Rule 3.850 motion, trial defense counsel, Justin Ward, testified on direct examination that he had seen a group of golf gift certificates that Pelkey had in his possession.  Doc. 18 Ex. U2 at 34.  On cross examination, he testified that he discussed possible defenses with Pelkey and formulated a defense position that inappropriate touching did not occur:

> Q When you met with Mr. Pelkey in reference to this case, did you discuss possible defenses with him?
>
> A Yes.
>
> Q And did that include a possible consent defense?
>
> A We discussed the possibility of a consent defense, but Mr. Pelkey told me that he didn't touch her inappropriately so there was no need to go into a self-defense – a consent defense.
>
> Q So it was pretty clearly identified from the outset of your discussions with Mr. Pelkey that his defense would be that this touching did not occur?
>
> A Oh, yes.
>
> Q All right.  And did he have a specific explanation for what happened to [the victim] that would cause her to think she had been sexually battered?

A Yes.  He described it as an energy release that she would perceive as a result of a massage.

Q Okay.  So part of his massaging technique caused [the victim] to have this energy release, which led her to believe she had been sexually battered?

A Yes.

Q But actually he had not touched her inappropriately in her vaginal area?

A Right.

Q Okay.  And was Mr. Pelkey adamant about this particular explanation or defense?

A Oh, yes, we spoke at length about the energy release and it's very spiritual.

*Id.* at 36-37.  Defense counsel testified regarding the golf gift certificates:

Q . . . [D]uring the rehearsals of Mr. Pelkey's testimony, did you talk at all about the golf gift certificates?

A I don't recall specifically.  It wouldn't surprise me either way.

Q Okay.

A We didn't plan on focusing on the golf certificates.  That may certainly come up, but I don't believe that there was going to be any dispute about the authenticity that she had given him those gifts so that's not something we're going to emphasize on.  The question was going to be whether or not he touched her in such a way that would lead her to believe incorrectly that she had been touched on her vagina.

Q So you didn't feel that the golf gift certificates advanced your theory of the defense?

A Right, especially because of the Williams Rule evidence that we needed to deal with.

Q All right.  Explain why in light of the Williams Rule evidence that was previously determined would be admitted in this case you decided that the golf gift certificates would not be that important?

A The golf gift certificates would not advance our theory of defense as to the Williams Rule witnesses.  Whereas the energy release explanation did cover both the victim in this case and Ms. B, the Williams Rule witness.

*Id.* at 37-38.  On cross, counsel further explained why the actual golf certificates were

not introduced:

Q Would it have been harmful to your defense to have brought out this testimony about the cards and about the going around and buying the gift certificates and all that sort of thing?

A I don't believe so.

Q It wouldn't really have even been inconsistent with your defense, would it Mr. Ward?

A Not – no, I don't believe so.

Q Wouldn't it have been entirely appropriate for you to say, look, this woman claims she was touched.  It's entirely possible that she was not touched but she thinks she was because of this referred touch thing that Mr. Pelkey talked about.  Yet there's a lot of evidence in this case that she didn't even think she had been touched.

For example, she left a card with a very friendly greeting just minutes after she had supposedly been sexually battered.  Then she spent a big part of the rest of that day going from one golf course to another, one from the north end of Leon County all the way down to central Wakulla County over many hours buying these golf gift certificates.

And then returned either later that day or the next day sometime and left those gift certificates, maybe with another card that you have identified here, again another warm greeting with many thanks.  Wouldn't those things have indicated that even though referred touch might have been the explanation that, in fact, there was powerful evidence that she didn't even believe this had happened?

A I thought to the contrary that if anything maybe that indicated that she did believe that she had been touched.

Q And what would that suggest about her state of mind?

A The way that Mr. Pelkey put it to me, I think his exact word was that she was acting crazy.

Q So in your view it would be appropriate for a woman who felt that she had been sexually assaulted without her consent to go and buy all these gift certificates and return them to him with these warm greetings and everything all later for many hours after this supposedly happened?

A I don't think she really viewed it as a sexual assault in the first place. She believed that she had been touched.  And I think it really didn't bother her.  I think that she liked it.  And this was the kind of thank you, Jim, I appreciate this.  This is great.

Q So if the jury had decided – a jury might have decided well, her buying all these cards means that in returning the gifts and returning the gift certificates maybe means that it never happened, or maybe on the other hand it means it did happen and she didn't have a problem with that?

A I think it may be indicative of that.  The problem that we run into is with Mr. Pelkey's testimony that he was adamant that it didn't happen.

Q Well juries sometimes reach conclusions in cases that are inconsistent with – would you agree that juries sometimes reach verdict of not guilty through reasoning through facts that are inconsistent with the defendant's testimony?

A I'm sure it's possible.  In my experience, I think if it appears that a jury has rejected my defendant's assertions, I don't recall them ever acquitting a defendant under those circumstances.  But anything could happen.

Q So why didn't you offer this testimony?

A Because it's a distraction.  We got it out there.  If I recall correctly, the issue was out there that she had given him gifts and that was not disputed.  But the focus of our defense was that he didn't touch her.  And we wanted to stick on that defense.  Rather than the shotgun approach, we wanted to focus on one main defense.

*Id.* at 40-43.  Trial counsel explained why he did elicit some testimony from Mr. Pelkey

regarding the golfing certificates the victim had given him:

> Q Why did you elicit that testimony if you didn't think it was helpful?
>
> A Because in discussing the testimony with Mr. Pelkey, he did want to mention the gift certificates because he thought it was so odd, like you mentioned, that if the woman had been sexually assaulted that she would turn around and give him these gifts.  And so he did want to mention it and so we mentioned it.
>
> Q But it was not anything you considered to be important?
>
> A Not with the strategy we had adopted.

*Id.* at 44.

The record thus supports the state post-conviction trial court findings of no

ineffective assistance of counsel.  Defense counsel testified the theory of defense,

agreed to by Pelkey, was that no inappropriate touching occurred.  Defense counsel

believed, as a matter of strategy, that introduction of the actual gift certificates would

serve as more of a distraction and may have caused the jury to question Pelkey's

position.  The trial transcript reflects, as testified to by defense counsel during the post-

conviction evidentiary hearing, that the gift certificates were mentioned during Pelkey's

testimony; therefore, the jury did hear about the certificates and, as defense counsel

also indicated, no dispute existed that the victim had purchased the certificates after the

massage giving rise to the charge in this case.  *See, e.g.*, Doc. 18 Ex. H at 107 (quoted

in detail in analysis of Ground 4, *infra*).  In addition, because Pelkey was not a licensed

massage therapist, payment for services was prohibited by statute; thus, defense

counsel may have reasonably decided, as a matter of strategy, not to focus attention on evidence of any additional possible criminal activity.  *See* Doc. 18 Ex. H at 94, 110-11.

Pelkey has not shown the state court ruling rejecting this claim resulted in a decision that was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d)(1)-(2).  This ground should be denied.

## Ground 2: IAC – Jury Questions

In his second ground, Pelkey asserts his trial counsel rendered ineffective assistance by not recalling the victim to the stand to answer three questions the jury submitted.  Doc. 1 at 4.  As Respondent indicates, in his Rule 3.850 motion, Pelkey asserted this argument within his claim attacking defense counsel's trial performance. Doc. 17 at 22; *see* Doc. 18 Ex. R at 10.  At the conclusion of the evidentiary hearing, the state post-conviction trial court discussed <u>Strickland</u> and denied the claim, making the following pertinent findings on the record:

> The question from the juror has been raised and it needs to be clear, the question specifically says, contrary I'm sure to what Judge Lewis [the trial judge] had instructed the jury, that this question is for the victim, that's how it starts out.  It was at the end of the defendant's testimony, but the jury specifically says, this is a question for the victim, inconsistent with the appropriate juror questioning, so it was not treated exactly as all jurors questions would be treated.

> Had it been a question for the defendant, there would have been discussion as to whether it was an appropriate question or not an appropriate question.  That did not occur.  Frankly, although Mr. Ward didn't accept this today, frankly as having been involved in many trials, I think it would have been – well, I know it would have been unusual for the

defense to call the victim to the stand to respond to those questions.  I believe that it would be potentially detrimental to the defense to call the victim back to the stand.  I think there is an implicit suggestion that I accept this witness' testimony when a party calls the person to the stand.  So I don't think it was unreasonable not to attempt to call the victim back to the stand and resolve the dispute, particularly since the testimony was already there.

I've reviewed the transcript, the questions related to when the cards were left there Mr. Pelkey testified they were after this event.  So it's part of the record and certainly something that jurors once they got together and discussed as a group I'm sure resolved that issue.

In short, even assuming Mr. Ward's conduct was ineffective, which I do not find I don't find that the verdict is subject to – or let me restate that.  It doesn't undermine my confidence in the verdict and now have considered what has been presented.  As I indicated, I don't think it would have conflicted with the testimony of the victim.  I think it's highly unlikely that it would have changed the verdict in this case.

So, I don't think the defense has established either that Mr. Ward acted unreasonably or that Mr. Pelkey was prejudiced by any of the allegations made.

Doc. 18 Ex. U2 at 71-72.  In the written order, the state court denied post-conviction relief "[b]ased on the reasons as announced on the record," and finding "defendant has failed to show that he received ineffective assistance of counsel or that he was prejudiced by the alleged deficiency."  *Id.* Ex. W.  On appeal, the First DCA per curiam affirmed the case without an opinion.  *Id.* Ex. BB.  These rulings are entitled to AEDPA deference and review is limited to the record before the state court.  *See* 28 U.S.C. § 2254(d); Cullen, 131 S. Ct. at 1402; Richter, 131 S. Ct. at 784-85; Wright, 278 F.3d at 1255.

The record supports the factual findings of the state post-conviction trial court.  In particular, during the hearing on the Rule 3.850 motion, trial defense counsel, Justin

Ward, testified regarding the questions from the jury after Pelkey's testimony and that,

as a matter of strategy, he did not believe it wise to focus on the victim's behavior after

the incident:

> Q . . . do you remember that there were some written questions that were submitted from the jurors?
>
> A Yes, this has come up.  Offhand, I don't remember during which testimony it was.  Maybe it was during Mr. Pelkey's testimony.  But it was something about the cards.
>
> Q And would it be inconsistent with your recollection that it took place at the conclusion of Mr. Pelkey's testimony?
>
> A I believe that's when it happened.
>
> Q Okay.  And do you remember what those questions were?
>
> A Not verbatim.
>
> Q I have here what's been marked as Defendant's Exhibit No. 9 for identification.  And I want to ask you, if you will, to look at questions numbered one and four on this . . . .  And do you see those questions, Mr. Ward?
>
> A Yes, sir.  It's specific to one and four?
>
> Q Yes, sir.  And what were those questions?
>
> A The first question was, did she go by his house three times after the alleged incident?  And question four was, did she give him golf tickets after the alleged incident?
>
> Q And is the word "after" in all caps?
>
> A Yes.
>
> Q Okay.  And would you have seen those questions when they were submitted?
>
> A Yes.

Q Did that – when those questions were submitted, did that suggest to you that perhaps you needed to reconsider your earlier decision not to make use of this business with the golf certificates and the cards and the going back to the house and that sort of thing?

A It didn't cause me to reconsider it, because – and I'm sorry to jump around like this.

Q That's all right.

A But you had asked me earlier if there was any inconsistency in the two approaches between the gifts that she gave him and also his assertion that he didn't touch her.  These told me that she believed that – excuse me, the gift certificates told me that she believed he did it and she liked what he did.  That's proceeding on a theory that he touched her and that it's arguably consensual.  But that's in juxta position to testimony from Mr. Pelkey that it didn't happen.

Q Well, why couldn't you have argued that if the jury didn't, in fact, believe it did happen as a result of these gift certificates, then that would put real problems in the way of the State establishing an essential element of this crime, which is the absence of consent by the alleged victim.

A I don't think it would have been wise to advance a theory that is directly inconsistent with the main theory that we were advancing of it not having happened.

Q Do you have experience with going through the testimony and saying this is something you may conclude, or you may conclude something different, but either way the defense wins?  You don't make those sorts of arguments?

A In some circumstances.  But to argue that he did touch her and it was consensual and also he didn't touch her at all, I don't think that's a good strategy.

Doc. 18 Ex. U2 at 47-50.

The record thus supports the state post-conviction trial court findings of no

ineffective assistance of counsel.  Defense counsel testified the theory of defense,

agreed to by Pelkey, was that no inappropriate touching occurred, and defense counsel

believed, as a matter of strategy, that introduction of anything that suggested touching did occur may have caused the jury to question Pelkey's position.  Defense counsel's strategic choices generally do not constitute deficient performance.  *See* Henry v. State, 948 So. 2d 609 (Fla. 2006); *see also, e.g.*, Waters v. Thomas, 46 F.3d 1506, 1518-19 (11th Cir. 1995) (en banc) ("We cannot, and will not, second guess such [strategic] decisions" that "trial counsel are called upon to make."); Dingle v. Sec'y for Dep't of Corr., 480 F.3d 1092, 1099 ("[C]onsidering all the circumstances, we give great deference to choices dictated by reasonable strategy.").

Pelkey has not shown the state court ruling rejecting this claim resulted in a decision that was either (1) contrary to, or involved an unreasonable application of, clearly established U.S. Supreme Court precedent, or (2) based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding.  *See* 28 U.S.C. § 2254(d)(1)-(2).  This ground should be denied.

## Ground 3: IAC – Failure to Investigate

In his third ground, Petitioner Pelkey asserts his trial counsel rendered ineffective assistance by failing to investigate the victim and offer a defense.  Doc. 1 at 5.  As Respondent indicates, however, Pelkey did not present this particular claim in state court.  Doc. 17 at 28; *see* Doc. 18 Ex. (Rule 3.850 motion).  Accordingly, this ground is unexhausted and procedurally defaulted.  *See* O'Sullivan v. Boerckel, 526 U.S. 838, 842 (1999) ("Before a federal court may grant habeas relief to a state prisoner, the prisoner must exhaust his remedies in state court."); *see also, e.g.*, McNair v. Campbell, 416 F.3d 1291, 1302 (11th Cir. 2005) (explaining exhaustion requirement: "[T]o ensure that

state courts have the first opportunity to hear all claims, federal courts have required a state prisoner to present the state courts with the same claim he urges upon the federal courts."); Smith v. Jones, 256 F.3d 1135, 1138 (11th Cir. 2001) ("[I]f the petitioner has failed to exhaust state remedies that are no longer available, that failure is a procedural default which will bar federal habeas relief, unless either the cause and prejudice or the fundamental miscarriage of justice exception is applicable."); Ward v. Hall, 592 F.3d 1144, 1157 (11th Cir. 2010) (explaining "[a] federal court may still address the merits of a procedurally defaulted claim if the petitioner can show cause for the default and actual prejudice resulting from the alleged constitutional violation" or if fundamental miscarriage of justice exists because "'a constitutional violation has probably resulted in the conviction of one who is actually innocent'" (quoting Murray v. Carrier, 477 U.S. 478, 496 (1986))).

Assuming Pelkey demonstrated cause and prejudice to excuse the procedural default, this ground lacks merit.  Pelkey asserts:

> Defense counsel was ineffective for failing to conduct an investigation on the victim.  An investigation is a mandatory part of the defense in any type of case.  Failing to conduct an investigation is failing to effectively offer a defense for the defendant.  In this case, counsel's failure to investigate the victim and her allegations prejudiced the defendant because counsel was not able to cross examine the victim about the past allegations of sexual assault, and/or rape.  The defendant's daughter discovered information ~~on a website~~ on the internet where the victim stated she had also been a victim of a rape that supposedly occurred sometime in 2001.  In that case, the victim is quoted as saying, "Before I knew what was going on, he was assaulting me."  In this instant case, during her deposition, the victim told those present, "Before I truly realized what was happening he had his finger inside me . . ."  This statement has an almost verbatim resemblance to statements made by the same victim accusing someone else of raping her five years prior to this incident.  This is something that defense

counsel should have found out and presented at trial to not only discredit the allegations of the victim, but to also show a pattern of falsely "crying wolf" by the victim.  Allowing the jury knowledge of prior allegations of sexual assault, with almost verbatim allegations by the victim, would have surely been favorable for the defendant and further put into question the truthfulness, or lack thereof, of the victim's allegations.  This information was accessible on the internet, and even if counsel is not computer literate to investigate a person's background on the internet, surely counsel could have investigated court cases or police reports to see if victim had made previous allegations in such a nature as in this instant case.  Counsel's failure to investigate this case prejudiced the defendant and prevented vital information from being presented to the jury, assisting in a conviction.

Doc. 1 at 5.

As Respondent indicates, the internet information Pelkey references is from June 2009.  Doc. 17 at 31; *see* Doc. 1-4 at 16.  Pelkey's direct appeal was pending at this point and his Rule 3.850 motion was not filed until December 20, 2010.  *See* Doc. 17 at 31; Doc. 18 Exs. K, Q, R.  Further, even assuming Pelkey demonstrated cause and prejudice to excuse the default, the information Pelkey points to would not have been admissible during his criminal trial and, thus, counsel did not render ineffective assistance if he allegedly failed to discover this information.  *See* Pantoja v. State, 59 So. 3d 1092, 1097-1100 (Fla. 2011) (holding that section 90.610, Florida Statutes, "does not permit impeachment of a witness with evidence of a prior accusation that did not result in a criminal conviction" nor is such evidence admissible under section 90.608(2) to prove bias or motive to lie, or under section 90.405(2) "as a specific instance of conduct to show that the victim was inclined to like about sexual abuse" as the victim's character was not essential element of defense or charge, and exclusion of such evidence does not violate rights to due process and confrontation of witnesses

under the Florida and U.S. Constitutions); *see also, e.g.,* O'Quinn v. Sec'y, Dep't of

Corr., No. 6:09cv217-Orl-36GJK, 2012 WL 750752 at *6-7 (M.D. Fla. Mar. 7, 2012)

(order by district judge denying § 2254 petition, discussing Pantoja, and concluding

defense counsel not ineffective "because the proffered evidence that the victim in this

case previously accused others of similar actions was not admissible at trial").  This

ground should be denied.

### Ground 4: IAC – Failure to Properly Impeach Victim

In his fourth ground, Pelkey asserts defense counsel did not properly impeach

the victim.  Doc. 1 at 5.  Pelkey asserts:

> Trial counsel was ineffective for not properly impeaching the victim.  Trial
> counsel did not inquire of the victim about trying to contact the defendant
> by numerous phone calls, voice mails, and home visits, for up to 10 days
> after the alleged incident.  Trial counsel also failed to impeach victim about
> the meaning or the victim's intent on presenting the defendant with golf
> certificates which the victim purchased for the defendant only hours after
> the alleged incident.  Had trial counsel properly and thoroughly impeached
> the victim, counsel would have brought forth answers to the juror's
> questions, leaving no room or need for the jurors to request additional
> information.  In addition, between the woman's police report, deposition
> and testimony, there were at least eight strong, impeachable
> contradictions that would highlight the falseness of her accusations.
> Failing to impeach the victim prejudiced the defendant and prevented the
> defendant from effectively and thoroughly confronting his accuser.

Doc. 1 at 5-6.  As Respondent indicates, the portion of this ground involving the golf

certificates, the victim's conduct after the incident, and the juror questions, is

substantially the same as Grounds 1 and 2, *supra.*  Doc. 17 at 34-35.  For the reasons

given in the analysis of those grounds, this ground should also be denied.  To the extent

Pelkey also asserts in this ground that counsel failed to impeach the victim with "at least

eight" contradictory statements apparent from a comparison of her police report, deposition, and testimony, Pelkey did not present this claim in state court and, therefore, it is unexhausted and procedurally defaulted.

Even assuming Pelkey demonstrated cause and prejudice to excuse his procedural default, the claim lacks merit.  Pelkey does not specifically identify, in his petition, the eight instances of contradictory statements.  *See* Doc. 1 at 5-6.  Because he has offered only a conclusory allegation, this portion of this ground should be denied on that basis.

Moreover, in his reply, Pelkey refers to a few instances that he may be pointing to as contradictory statements by the victim.  In somewhat rambling fashion, Pelkey refers to the underwear victim wore to the massage appointment when the incident occurred, the victim's description of how she felt during the incident, how long that massage appointment lasted, a "possible biological explanation" for the victim's reaction or energy release, the victim's lack of reaction when the incident occurred, the victim's behavior immediately and in the days after the incident, and the victim's motive in filing a police report.  Doc. 19 at 6-26.  Under the section addressing Ground Four in his reply, Pelkey again refers to the July 2009 internet information regarding the victim, addressed in the analysis of Ground 3, *supra*.  Doc. 19 at 51-52.  Pelkey also again refers to the victim's conduct immediately and in the days after the incident, addressed in the analysis of Grounds 1 and 2, *supra*.  Doc. 19 at 52-53.  Other "simple inconsistencies" Pelkey points to are the victim's statement in her deposition that she no longer trusts people and "[i]n less than two years from the alleged incident she was

married.  How did that happen if she doesn't trust anyone?" *Id.* at 52.  Pelkey

continues:

> During the trial she stated that she had not wanted a personal relationship
> with me, yet she had invited me to be her roommate and work on her
> house in lieu of paying rent.  She had said she couldn't afford to pay for
> the work that needed doing, so how could she afford the expensive gifts
> she gave me?  Not only were they expensive, they were also extremely
> inappropriate for the client-therapist relationship.  (I doubt she spent that
> much, if anything, on her hair-dresser, her postman, or any other service
> personnel within her "circle.")  In addition, she had asked me to spend
> Thanksgiving with her, and extended an invitation for both Christmas and
> New Year's celebrations.  I had turned her down on all occasions.  My
> attorney alluded to some of this in his opening statement, but he failed to
> follow through during the trial, didn't question her about any of it even
> when she denied wanting a personal relationship with me, and did not
> mention it again even in his closing remarks.  This was yet another
> indication of my attorney's inability (or unwillingness) to do his job, to bring
> out the inconsistencies in her testimony and the testimonies of the other
> witnesses, and fully present a defense on my behalf.

Doc. 19 at 52-53.

As Pelkey acknowledges, defense counsel did allude to, and bring out through

witness testimony, many of these alleged inconsistencies during the trial.  In the

opening statement, defense counsel said, in part:

> The reason that she went to the police and the reason that we are here
> today is because he didn't call her back.  Why didn't he ever call her back
> and get back to her?  Because he had been trained to stay away from
> things like this, because when this happened he saw her reaction.  It ws
> an instantaneous thing that she had, where she gasps, she arches her
> back and Mr. Pelkey stops, he stops right there.
>
> This is at the end of the massage.  He says, Are you okay?  She
> says yeah.  Really, are you okay?  She says, Yeah, I'm okay.  And they go
> on downstairs, they are talking and she never says what happened.  Why
> did you just touch me?  She is apparently wondering at that point, Well,
> may be something can happen with me and Mr. Pelkey.

Mr. Pelkey will further describe the relationship that they had been building up to this time.  What she wanted, there's no way for us to know, but Mr. Pelkey, at least, had got the impression that she was somewhat interested in him.  She had spoken to him about his plans for Thanksgiving.  What are you doing for Christmas?  Maybe we can do something together.

On this day that she comes in for this massage, and there's a dispute over this, but what kind of underwear she's wearing.  Mr. Pelkey is very specific that there is a different kind of underwear this day.  It was a tight, black lacey underwear that she was wearing.  She would normally wear what he called granny panties.  So this is a little off base with her.  He doesn't know what to expect from her.  The girl suddenly reaches climax from him not even touching her there, and then she starts calling and calling and coming by.  What's going on?  And he doesn't want anything to do with it.  He wants nothing to do with this mess and so he doesn't call her back.

But then, because he doesn't call her back, that's all she wanted.  She wanted him to call her.  He wanted – she wanted him to talk to her.  When she didn't get that, and these are her words, She just assumed the worst.  That's what we are here for today.  Should you also assume the worst or should you consider whether there is any reasonable doubt?

Doc. 18 Ex. H at 26-27; *see id.* at 23 (prosecutor referencing victim's conduct after the incident: "[S]he made some phone calls to the defendant trying to find out – she wanted to discuss it with him, why is it that you did this to me, offer me some explanation for, you know, how it is that this could happen, before she called the police.  And he didn't call her back, and, eventually she did end up calling the police.  So, some of her actions are not what you would expect.").  During direct examination, the victim testified that she did not immediately report the incident to the police because she "was confused" and "respected him immensely," and she did not know "if maybe it was some other form of massage therapy or something."  *Id.* at 42.  She "wanted to talk to him about it" before doing anything because she "wanted to understand what had just happened." *Id.*  She

testified that she called Pelkey several times, made another appointment, and "then

right before the appointment was supposed to happen, he called and canceled."  *Id.*

She testified she was not planning to get another massage, she had just wanted to find

out "what had gone on, why he had done that."  *Id.* at 42-43.  She testified that Pelkey

would not respond to the phone calls and she then went to the police: "And with no

contact, eventually I had to assume that it wasn't a mistake and that what he had done

was wrong."  *Id.* at 43.  On cross-examination of the victim, the following occurred,

including questions about what she had said in her deposition:

> Q . . . [I]n response to what Ms. Foy [victim's friend] told you, did you feel
> that there was no reason to be concerned about what happened?
>
> A Based on my conversation with my friend –
>
> Q Yes.
>
> A  – yes.
>
> Q But you were still concerned about what happened?
>
> A Yes, because I know what happened.
>
> Q And you wanted Mr. Pelkey to contact you?
>
> A I want to understand why he did what he did.
>
> Q It was an awkward experience, wasn't it?
>
> A That would be one way of saying it, yes.
>
> Q From the time – actually before that particular touching occurred, he
> was working your inner thigh?
>
> A Yes.
>
> Q And that's on your right leg?

A Yes.

Q Originally, you weren't sure whether or not he was penetrating you?

A It's not that I wasn't sure that he was penetrating me.  It's that I was confused about what was happening.

Q Do you recall giving a sworn deposition in this case on July 29th of last year?

A Yes.

Q And that was Mr. Remland . . . Do you recall the conversation that you were having with Mr. Remland about whether there was any kind of penetration?

A Yes.

Q And what – didn't you eventually answer that you weren't sure if he was entering you at first?

A And then I said I wasn't exactly sure what I was feeling at first.

Q You thought you were off base?

A I thought I was off base, but then I knew I wasn't off base.  I was confused in the beginning.

Q After the massage ended, you walked downstairs with him; right?

A No.  He walked downstairs first.  I got dressed.

Q You went downstairs when you started to talk to Mr. Pelkey?

A Yes.

Q And while you're talking to Mr. Pelkey, then, you didn't say anything about anything being wrong?

A He started to talk to me about what had happened and I was going to let him talk first.

Q The only thing that you ever told him was that you were okay?

A Immediately afterward, yes.

Q And you suspect that you had misinterpreted what had happened?

A Did I – I'm sorry? Can you repeat the question?

Q Did you suspect that you misinterpreted what had occurred?

A I was afraid that I might have. I was afraid that he was trying to do some form of massage therapy.

Q And you would be fine if he had just explained himself?

A Had he explained – had he explained something to me, anything, he could have lied to me, I probably would have bought it hook, line and sinker.

Q So, it didn't really matter what he told you?

A I didn't want to think that somebody that I respected so much would have violated me in such a personal way.

Q You just wanted to know something?

A Yes.

Q And so when you didn't hear anything, you just assumed the worst?

A Yes.

Q And that's why you went to the police?

A Yes.

*Id.* 47-50. On re-cross, defense counsel further questioned the victim about what she had said in deposition:

Q When you were speaking to Mr. Remland and Ms. Ray during the deposition, you addressed whether it might be some new experimental massage technique?

A I questioned whether it was, yes.  I wanted to believe that he wasn't doing something bad to me.

Q And your thought was that even if it's experimental, Groovy, I'm find with that?  Aren't those your words?

A Not groovy, that I'm fine with that, but I would have felt better that at least he was doing something not maliciously.

MR. WARD: I'm looking at the top of Page 40.  May I approach?

THE COURT: Yes, sir.

BY MR. WARD: And this is in response to my question that came up . . . and you addressed the issue of whether it may be experimental technique.

A Are you – I don't understand what you're asking me.

Q Were you discussing the thought that it might have been and experimental technique?

. . . .

THE WITNESS: Mr. Remland asked me a hypothetical question.  He said he – and he could have been – he questioned, He could have been afraid or something?  Maybe you took it the wrong way or maybe he just didn't want to deal with it or something, who knows.

And then Ms. Ray asked, Is that was a question?

And then Mr. Remland said, Yeah, a hypothetical?

And I responded, But even so, he was given multiple opportunities along the way to answer that.  You know, even when Investigator Bascom went and talked to him and I even told her – I even told her, if he has a reason for it, if he has a valid form of massage therapy, even if it's experimental, groovy, I'm fine with that.  I'll take it, because I didn't think that he was manipulating – I didn't want to think that he was manipulating me into being able to use me in some way, shape or fashion, but he never responded.  And he always – he has always said, you know, whatever.  And to this day, he's never responded.  So, how – I mean, if he is scared, whatever.  Get over it.  Just tell the truth.

*Id.* at 53-55.  During Pelkey's testimony, defense counsel inquired about the victim's

actions after the incident:

> Q After [the victim] said that everything was okay and that she was fine, what happened after that?
>
> A I stopped the massage immediately and I talked to her a little bit because she was – she was crying.  And any type of emotional release, it's not my first time that this had happened with a client.  It happens quite often, especially with people who are hiding a lot of emotion and trauma. So I didn't really think that much of it at the time, because it's happened to – it had happened to me before on several occasions in many different places on the body, so you never know where that might happen.
>
> Q Would [the victim] leave you a tip or a thank you card or anything like that?
>
> A She started leaving me tips after I left Core, after I got done with school, yes.
>
> Q Was there anything that you required of her?
>
> A No, I did not.
>
> Q Would she ever give you any other gifts?
>
> A Yes.  She gave me a Christmas gift, I guess.  It was five – it was an envelope that had five golf – rounds of golf in various places, about $120 worth of stuff and it was like, I still have them.  It wasn't what I – you know.
>
> Q And so this would have been on December the 23rd, right before Christmas?
>
> A No.  She gave me the card and then she – I found them on my door when I came home one day.  They were in a bag, so.
>
> Q Did you go ahead and schedule a new appointment with her?
>
> A Yes.
>
> Q What happened with that?

A Well, she called me a couple of days later wanting to – demanding that I talk to her immediately.  And I – I scheduled an appointment for that Friday that she could come by and talk to me, six o'clock that Friday.  And I got stuck working down –

Q Is this a different appointment from what you originally scheduled when she left?

A Yes.  I'm sorry.  The original appointment she left was three weeks out, the middle of January, I believe.

Q So you made an earlier appointment for her?

A Yes.  When she called me and demanding all of this, that I talk to her about this stuff, I had made an arrangement for that following Friday at six o'clock, but I wasn't able to make that and called her and canceled that appointment.

Q Why aren't you able to make that appointment?

A I was stuck down in St. George Island.

Q What were you doing on St. George?

A A friend of mine had a roof leek and needed the ceiling fixed, so that's about the only time I could work on that place down there was through the weekend.

Q You guys had scheduled the appointment for six o'clock?

A Yes.

Q What time did you call her to let her know that you wouldn't be able to make it?

A I think I was pretty late, about four or five o'clock that day.

Q What other contact did you have with her during this time?  Any phone calls?  Any conversations?  Meeting in person?

A Well, after that, after that first phone call, after I canceled that Friday, she started stopping by my place and banging on my door and I never answered the door.

Q Why not?

A Well, twice I was up.  I'd just got home from work and I was up in the restroom and the third time I was taking – just laid down to take a nap, and, at that point, I didn't want anything to do with her, not in that context. If she wanted on sit down and have a reasonable conversation, but she was – she was being very demanding, very accusatory and I wasn't sure what the accusations were all about, other than maybe that energy release.  But I'm not a psychiatrist . . . .

*Id.* at 106-09.  And, finally, during closing, defense counsel again focused on the

victim's reaction and behavior after the incident, including the following:

What's really going on with [the victim]?  Was she pursuing something with Mr. Pelkey?  I don't know.  And that's the thing, there are lots of questions that we just don't have answers to.  We just don't have answers.  But there's something that's clearly off about [the victim].  That's not to say she's not a bad person.  I'm not trying to vilify her, but can we rely on what she thinks happened when she says that she was so confused and unsure and she didn't know what to do?

And think about how she reacted . . . . [S]he was obsessed with this, she was obsessively thinking about that and she repeatedly, not only calls him, but she goes to his home, banging on his door.

Can you blame Mr. Pelkey for reacting the way he did?  He reacted the way he did by avoiding her, because that's what he had been trained to do. . . .

. . . .

Now, we couldn't get a straight answer out of [the victim] about how long that she says this occurred. . . .

. . . .

And then we have this.  She says that he not only went too close, but that he violated her.  If he had actually started to reach into her underwear, like she says, at that point when she's wondering, Hey, what's going on?  That's where you have got to say something.  Just ask, Hey, what's going on?

. . . .

It would have never come out about, at least not to this point, if Mr. Pelkey just picked up the phone and given the girl a call that she wanted. Was she out for a relationship with him?  Maybe.  You know, if a woman was truly violated and she just wants a call back, it doesn't sound like she was violated in that sense.  You know, she thinks that she was touched and she wants to know where it's going.  Where is this going?  You know, maybe something could be here?

But, no, when it becomes clear to her that he's shying away from that, something bad is happening there and it's bad news and stay away, and that's not what she wanted to hear.  That's not the response she wanted.  She assumed the worse.

*Id.* at 154-62.

Based on the foregoing, defense counsel did challenge the victim's account and actions, and used her deposition during her trial testimony to point out discrepancies. Pelkey has not shown entitlement to federal habeas relief.  This ground should be denied.

## Ground 5: IAC – Failure to Object to Prosecutor Statements

In his fifth ground, Pelkey asserts defense counsel did not object to statements the prosecutor made during the direct examination of the victim that were not supported by witnesses' testimony or evidence presented.  Doc. 1 at 6.  As Respondent indicates, Pelkey did not present this claim in state court.  Doc. 17 at 39.  Accordingly, this ground is unexhausted and procedurally defaulted.  *See* O'Sullivan, 526 U.S. at 842; *see also, e.g.*, McNair, 416 F.3d at 1302; Smith, 256 F.3d at 1138; Ward, 592 F.3d at 1157.

Even assuming Pelkey demonstrated cause and prejudice to excuse his procedural default, the claim lacks merit.  Pelkey asserts:

Trial counsel was ineffective in that counsel refused to object to prosecutorial statements not supported by witnesses or evidence.  In questioning the victim, the State said, "All right.  And in the middle of that story, he said something about, "The reason why I did that is . . .""" (See trial transcript, page 40, line 25, page 41, line 1).  This is an untrue statement, not supported by any witness testimony, or any other evidence.  This untrue statement by the State inflamed the minds of the jurors, insinuating that, at some point, the defendant admitted his guilt in this matter.  This untrue statement by the State was highly inflammatory, prejudicial, biased, and harmful toward the defendant.  But more than that, the statement was totally untrue, yet defense counsel failed to object to this act of prosecutorial misconduct, giving the trial court an opportunity to strike the State's statement and give curative instructions to the jury, or at least, reserve this issue for review on direct appeal.  Counsel's failure to object to the obvious untrue statement made by the State is harmful towards the defendant in itself, and left the jurors to accept the State's statement that at some point in questioning, the defendant admitted guilt to the charged allegation.  This is clearly ineffective assistance of trial counsel which prejudiced the defendant.

Doc. 1 at 6.  As Respondent points out, the context of the challenged remark about a "story" reflects that it is actually within an answer the victim gave to a question by the prosecutor, and then within a follow-up type question posed by the prosecutor during direct examination of the victim:

Q [prosecutor] Was there any conversation about what had happened afterward [following the incident during the massage]?

A [victim] Afterwards when I went downstairs, he started to try and explain to me.  It was really weird, though.  He started telling me about the story about this time that he had had a massage and the person who was giving him the massage, he noticed that she had a pure white aura, which the only other person that he had ever seen like that was his mother, and that this person had two angels on her shoulders.  And I think he was getting ready to explain something else, but then the next client came in **so he had to stop the story**.

Q All right.  And **in the middle of that story, he said something about, The reason why I did that is** –

A He didn't get to anything, though.

Q So, your understanding was that where **this story** was going was some explanation for why he penetrated you digitally?

A I think that's where he was going, yes.

Q But you never got there?

A But we never got there because the next client came in.

Doc. 18 Ex. H at 40-41 (bold emphasis added).  Just prior to this, the victim had

testified:

Q All right.  What happened next?

A He was working on the inside of my thigh and he got really close to my genital area, but, you know, didn't go anywhere – didn't go to it.  And then he had me switch legs and butterflied the other leg.  And this time he got really close to my genital area and then I felt him – I felt a finger inside me and he was using his other hand to stimulate the area above my pubic bone.

Q All right.  So, he reached underneath your panties?

A Yes.

Q And put his finger inside your vagina?

A Yes.

*Id.* at 38.  Thus, the victim had already testified that Pelkey had digitally penetrated her

before the testimony and question about the story explaining, or attempting to explain,

Pelkey's behavior.

    Further, as the Respondent indicates, a review of the victim's pre-trial deposition

and her testimony at the April 1, 2009, <u>Williams</u> Rule evidentiary hearing, reveals the

prosecutor had a basis for the follow-up question about the story.  *See id.* Ex. F at 10-

11, Ex. S at 251.  In particular, in the deposition, the victim stated:

> I was confused.  I mean, I will admit that I was very confused.  I
> was – I wanted to know why, but I didn't know how to bring it up, and I
> think he started to try and tell me, because he did try to tell me a story,
> and I don't remember everything about it now.  I just remember he was
> talking about he had seen some woman with a white aura, something
> about she had had two children and he had asked her about the children,
> and they were angels or – I don't remember all of that, but I think he was
> trying to tell me that story to lead me into why he had done what he did,
> but that's when the next client showed up.

*Id.* Ex. S at 251.  Similarly, during the evidentiary hearing, the victim testified that after

the incident, as she was leaving, Pelkey started to tell her a story:

> [W]e started to talk and I think he started to tell me why he did what he
> did.  It was a cracked out story about you know when he was getting a
> massage from another massage therapist.  It was some woman that had a
> white arua, is the only other person he has ever seen with a white aura
> besides his mother and he noticed that she had angels on her shoulder.
> And he started to tell me the story and then the next client came in, and so
> we were interrupted.

*Id.* Ex. F at 10-11.

Based on the foregoing, Pelkey has not shown defense counsel rendered

ineffective assistance by not objecting during this portion of the direct examination of the

victim.  This ground should be denied.

### <u>Ground 6</u>: IAC – Failure to Object to Prosecutor's Closing Argument

In his sixth ground, Petitioner Pelkey asserts trial counsel rendered ineffective

assistance by not objecting to allegedly inflammatory remarks made by the prosecutor

during closing arguments.  Doc. 1 at 6-7.  As Respondent indicates, Pelkey did not

present this claim in state court.  Doc. 17 at 44.  Accordingly, this ground is

unexhausted and procedurally defaulted.  *See* <u>O'Sullivan</u>, 526 U.S. at 842; *see also,*

*e.g.*, <u>McNair</u>, 416 F.3d at 1302; <u>Smith</u>, 256 F.3d at 1138; <u>Ward</u>, 592 F.3d at 1157.

Assuming Pelkey has demonstrated cause and prejudice, this ground lacks

merit.  In this ground, Pelkey asserts:

> Trial counsel was ineffective in that counsel failed to object to
> inflammatory remarks made by the State in closing arguments.  The State
> told the jury that the defendant used his massage practice to lure women
> in so he could molest them.  The State offered this statement as if this was
> evidence already presented to the jury, which it was not.  The defendant
> had 60-70 clients, both male and female, with not a single complaint
> issued towards him, other than the alleged complaint of sexual misconduct
> lodged by the victim.  These are the facts of the case, not the
> inflammatory accusations made by the State.  Trial counsel refused to
> object to such inflammatory statements by the State, even though the
> defendant was strongly urging him to do so.  These remarks by the State
> was [sic] inflammatory and negatively influenced the jurors' minds toward
> the defendant, and failure by defense counsel to object to such
> inflammatory statements by the State allowed the jurors to accept the
> State's version of this offense without any rebuttal by the defense.  This
> further prejudiced the defendant.

Doc. 1 at 7.

In Florida, both the State and the defense have wide latitude in closing

arguments.  *See* <u>Ford v. State</u>, 802 So. 2d 1121, 1129 (Fla. 2001).  In federal habeas,

"[t]he relevant question is whether the prosecutor's comments 'so infected the trial with

unfairness as to make the resulting conviction a denial of due process.'" <u>Darden v.</u>

<u>Wainwright</u>, 477 U.S. 168, 181 (1986) (quoting <u>Donnelly v. DeChristoforo</u>, 416 U.S. 637

(1974)).  The comments must have been improper and have rendered the trial

fundamentally unfair.  <u>United States v. Eyster</u>, 948 F.2d 1196, 1206 (11th Cir. 1991).

A review of this record does not indicate the prosecutor's comments, even if questionable, rose to such a level as to result in an unfair trial or deprivation of due process.  *See* Darden, 477 U.S. at 181 (finding that prosecutor's comments "undoubtedly were improper," but that was not enough for habeas corpus relief as the question was whether the comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process").

Indeed, as Respondent indicates, the particular comment referenced by Pelkey – that the prosecutor told the jury that the defendant used his massage practice to lure women in so he could molest them – does not appear, at least not verbatim, in either portion of the State's closing.  *See* Doc. 17 at 45; Doc. 18 Ex. H at 147-50, 164-70. From a review of the closings, the closest comments to the one alluded to by Pelkey appears to be the prosecutor stating in the first closing:

> The evidence has shown that the defendant in this case took advantage of the trust and the power that he was given as a part of masseuse/client relationship.  He established the trust of [the victim] over the several months that she was seeing him as a client and she believed him to be a consummate professional, she believed him to be a gentleman and she also believed him to be a spiritual man and she revered him as such.
>
> Recall that there was nothing improper leading up to the moment that the defendant inserted his finger into [the victim's] vagina.

Doc. 18 Ex. H at 147.  This line of argument is based on the victim's testimony as well as that of Pelkey regarding the building of trust between the client and the student massage therapist.  *See id.* at 31-40, 94-95.  The prosecutor also argued, in the rebuttal closing:

> This is not a mistake.  This was the defendant's M.O.  And this victim was
> just in the wrong place at the wrong time and happened to be gullible
> enough to buy into what the defendant was selling.

*Id*. at 168.  The prosecutor made this argument to counter the defense position that

what Pelkey did was not inappropriate touching and, instead, he had touched her

elsewhere on her body and that caused her to have the sexual release she had.  The

prosecutor's comment was based, at least in part, on the expert witness testimony that

there was not a pressure point or massage technique that would cause a client to feel

she was being vaginally penetrated or stimulated.  *See* Doc. 18 Ex. H at 82.  These

comments, assuming they the ones Pelkey challenges here, do not appear improper or

rise to the level of fundamental error.  *See, e.g.*, U.S. v. Morris, 568 F.2d 396, 401 (5th

Cir. 1978) ("The purpose of summations is for the attorneys to assist the jury in

analyzing, evaluating, and applying the evidence. . . . The assistance permitted includes

counsel's right to state his contention as to the conclusions that the jury should raw from

the evidence.  Therefore, an attorney's statements that indicate his opinion or

knowledge of the case as theretofore presented before the court and jury are

permissible if the attorney makes it clear that the conclusions he is urging are

conclusions to be drawn from the evidence.").

Indeed, this Court's review of the record does not indicate any of the prosecutor's

closing comments, even if questionable, rose to such a level as to result in an unfair trial

or deprivation of due process.  *See* Darden, 477 U.S. 168, 181 (1986); Eyster, 948 F.2d

at 1206; *see also* Tucker v. Kemp, 802 F.2d 1293, 1296 (11th Cir. 1986) ("If a reviewing

court is confident that, absent the improper remarks, the jury's decision would have

been no different, the proceeding cannot be said to have been fundamentally unfair."). This ground should be denied.

### <u>Ground 7</u>: IAC – Trial Counsel's Testimony at Rule 3.850 Hearing

In his seventh ground, Pelkey asserts trial counsel failed to admit, during his testimony at the hearing on the Rule 3.850 motion, that counsel knew Pelkey's ex-wife and had discussed particulars of his case with her without Pelkey's permission.  Doc. 1 at 7.  As both Pelkey and Respondent indicate, Pelkey did not raise this claim in state court and has presented it for the first time in this federal habeas petition.  *Id.* at 7-8; Doc. 17 at 47.  Thus, this claim is unexhausted and procedurally defaulted.

Even if Pelkey demonstrated cause or actual prejudice to excuse the default, this ground does not warrant federal habeas relief.  Pelkey asserts:

> Defense counsel failed to admit at defendant's evidentiary hearing that counsel closely knew defendant's ex-wife, and had discussed particulars of defendant's case with her, without defendant's permission.  Defendant alleges that trial counsel knew all along that the defendant was the ex-husband of Margie Quillman, whom he knows well, and as such, should have informed the defendant and the court of this information to determine whether there was a conflict of interest in representing the defendant. However, defense counsel not only withheld this information from the defendant and the trial court, as well as the appellate court, but counsel also violated attorney-client confidentiality by discussing particulars of defendant's case with Margie Quillman.  These violations on behalf of defense counsel clearly show ineffectiveness in effectively defending the defendant and gives questions as to the reasons why counsel was so blatantly ineffective.  Because appellate counsel did not raise this issue on defendant's 3.850, does not mean that this court cannot review the constitutional violations committed against the defendant through ineffectiveness of trial counsel brought forth in this grounds as a de novo ruling.  Defense counsel willfully and admittedly violated defendant's constitutional rights and denied defendant effective assistance of counsel, further prejudicing the defendant and assisting in the guilty verdict rendered against the defendant.

Doc. 1 at 7.  As Respondent indicates, even if defense counsel knew Pelkey's ex-wife, this in and of itself does not result in a conflict of interest.  *See* R. Reg. Fla. Bar 4-1.7, 4-1.9.  Moreover, even if Pelkey's allegations concerning counsel's conduct warranted professional discipline, this does not, in and of itself, establish ineffectiveness under Strickland. *See generally* Roe v. Flores-Ortega, 528 U.S. 470, 479 (2000) (quoting and citing Strickland, explaining "[p]revailing norms of practice as reflected in American Bar Association standards and the like . . . are only guides" and "while States are free to impose whatever specific rules they see fit to ensure that criminal defendants are well represented, we have held that the Federal Constitution imposes one general requirement: that counsel make objectively reasonable choices").  Pelkey does not explain how these allegations affected counsel's performance or prejudiced his case.  This ground should be denied.

### **Ground 8**: IAC – Failure to Offer Expert Testimony

In his eighth ground, Pelkey asserts trial counsel rendered ineffective assistance by not offering expert testimony in Advanced Sports Massage Therapy, to counter the State's presentation of expert testimony.  Doc. 1 at 8.  As both Pelkey and Respondent indicate, Pelkey did not raise this claim in state court and has presented it for the first time in his federal habeas petition.  *Id.* at 8; Doc. 17 at 51.  Thus, this claim is unexhausted and procedurally defaulted.

Even assuming Pelkey demonstrated cause or prejudice to excuse the default, the ground lacks merit.  Pelkey asserts:

>Counsel was ineffective for refusing to offer professional testimony in the form of an expert in Advanced Sports Massage Therapy. The State offered testimony from the owner and an instructor from Core Institute of Massage Therapy, however, defense counsel refused to offer expert testimony for the defense. Refusing to provide defense's own expert witness on massage therapy left the jury to accept the State's expert's testimony as testified, further denying the defendant effective assistance of counsel. Failing to offer expert testimony for the defense was failure to effectively defend the defendant.

Doc. 1 at 8. As Respondent indicates, Pelkey does not indicate what an expert in "Advanced Sports Massage Therapy" would have said. *See* Doc. 17 at 52. From Pelkey's allegations, it appears this issue arose during the preparation of Pelkey's defense, and defense counsel declined to enlist such an expert. As Respondent also indicates, "calling some witnesses and not others is 'the epitome of a strategic decision.'" Chandler v. United States, 218 F.3d 1305, 1314 n.14 (11th Cir. 2000) (quoting Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995)); *see* Doc. 17 at 53.

Indeed, defense counsel may well have decided that any relevant information concerning the massage technique Pelkey used could effectively be presented at trial through cross-examination of the State's expert and through Pelkey's own testimony. Review of the trial transcript reveals that defense counsel did inquire of the State's massage therapy expert, George Kousaleos, on cross-examination, eliciting testimony that it was possible for a person to be sexually aroused by being touched, or massaged, on her thigh, Pelkey's theory of defense:

>Q Performing a massage it's all about touch, right, and it's not just a physical experience; is that true?
>
>A For some it can be an emotional experience.

Q Emotional?  Psychological?

A Yes.

Q We just need you to answer out loud.

A Sorry.

Q  Do you encounter referral points during a massage?

A There are known referral points that are related to the pathway of a nerve.

Q Can you explain to our jury, please, what a referral point is?

A A referral point can be an area that can be worked on and send a neurological – can I use the term message, if we all accept that as a common term – message to the – to the – through the pathway of the nerve back into either the spine or to the – to the distal or the long end of the nerve.  So I could work on the calf and there's a nerve that goes down to the foot, a person gets a sensation in the foot.

Q There are nerves in the thigh?

A They [sic] are nerves in the thigh that come from the lower back.

Q And so that pathway goes straight through the pelvic region?

A Not through it, it goes in the pathway of the nerves.  The nerves come from the lower back, some going down the back of the leg, some going down the lateral side of the leg, some to the front of the leg and some to the inside of the leg, but they don't go through the middle of the pelvis. They go from the back, around or straight down.

Q It's like a network of nerves?

A Absolutely.

Q Now, also in your teachings at the Core Institute, don't you also teach myofascial work?

A I am the teacher of that course.

Q Explain to us what fascia are, please.

A Fascia is the connective tissue that either surrounds individual muscles, surrounds each bone or a denser layer that surrounds the whole body like a tight elastic stocking.  It's called the inner skin.

Q So, essentially, every part of our body is connected to each other part through facia [sic]?

A Exactly. Exactly.

Q So when you manipulate something in one region of the body through facia [sic], it can also affect what happens in another region of the body?

A There can be a stimulation through the nerves.  Again, because the fascia in embryonic development is what developed first, it sort of became the first soft tissue of the body, also was the vehicle that the spinal nerves were pulled to the far distal ends of the body.  So, many of those nerves rest on the fascial plains.

Q Is it necessary to touch a person in a sexual region in order for that person to experience a sexual response?

A Again, this is not something that we teach in massage, but through common literature I think we all know of different places in the body that for some people are more stimulating sexually than other areas.  If you blow in my ear, I will follow you anywhere, is a common saying.

Q So, it's possible –

A It's possible, certainly.

Q So they can receive that sexual or a sense of arousal by being touched on their elbow or their ear or their thigh?

A Right.

Doc. 18 Ex. H at 82-85.  Pelkey testified that he was massaging the victim's inner thigh,

trying to address her complaint about back pain, and had "made three or four strokes

down that inner medial thigh and that's when the release of energy came and it was just

that instant."  *Id.* at 103-04; *see id.* at 99-103 (Pelkey's testimony describing the "five-point routine" he uses "for people who complain about lower back").  Pelkey testified he stopped the massage immediately and he had not touched the victim's vagina or done anything sexual.  *Id.* at 106.  In closing, defense counsel argued, in part:

> Let's consider some other things when we assess what really happened here.  First of all, [the victim] what she describes, it amounts to her having an orgasm.  Mr. Pelkey says, I don't know what it was.  It was some kind of energy release, you know, but it's apparently that's probably what it was.
>
> . . . .
>
> This was an odd response.  No doubt it's abnormal, but that doesn't mean it didn't happen and we know it can happen.  We know it not just because Mr. Pelkey tells us that he didn't touch her there, but also consider the testimony that we consider from Mr. Kousaleos, however he says his name.  And he says that, sure, you can touch a person at one spot and they can have a perception at another spot.  For example, you have the nerves that are in the lower back and the nerves that are in the thigh and they connect to each other.  You touch a person in one spot, they can feel it in another spot.
>
> You can also have some sort of sexual sensation even though nothing is intended that way or actually done that is truly sexual.  As Mr. Kousaleos said, blow in my ear and I will follow you forever, or something to that effect.  And you can touch a person anywhere, the ear, the elbow, and it's possible they can receive a sexual response.

*Id.* at 151-53.

Based on the foregoing, Pelkey has not shown entitlement to federal habeas relief.  This ground should be denied.

### Ground 9: IAC – Failure to Object to Admission of Collateral Crime Testimony

In his ninth ground, Pelkey asserts trial counsel rendered ineffective assistance by failing to object to the trial court's admission of testimony by P.B.  *Id.* at 8-9.  As

Respondent indicates, Pelkey appears to have raised this IAC claim based on his claim of trial court error presented in his direct appeal; however, the error was presented in the state court as one of trial court error, not one alleging IAC.  *See* Doc. 17 at 54-57. The claim was not raised in state court as one alleging IAC.  Thus, this claim is unexhausted and procedurally defaulted.

Even assuming Pelkey demonstrated cause or prejudice to excuse the default, the ground lacks merit.  As Respondent points out, defense counsel repeatedly challenged and objected to the admission of P.B.'s testimony.  *See* Doc. 17 at 58-59; Doc. 18 Exs. D, F, H at 65.  Defense counsel thus preserved the issue for appeal of the trial court's admission of the testimony under section 90.403 and 90.404(2)(a), Florida Statutes.  Appellate counsel raised a point on appeal alleging the admission of this testimony constituted reversible error under Florida law.  *See* Doc. 18 Ex. N.  The First DCA affirmed, per curiam, without a written opinion.

Under Florida law, similar fact evidence of other crimes, called Williams Rule evidence, "is admissible when relevant to prove a material fact in issue," such as motive, intent, preparation, or plan.  Fla. Stat. § 90.404(2)(a); Williams v. State, 110 So. 2d 654 (Fla. 1959); Lamontagne v. Sec'y, Dep't of Corr., 433 F. App'x 746, 749 (11th Cir. 2011).  In this case, in January 2009, the State filed a Notice of Intention to Use Similar Fact Evidence in re: Victim P.B.  Doc. 18 Ex. C.  On March 11, 2009, defense counsel filed a written objection, citing only Florida law.  *Id.* Ex. D.  The trial court held a hearing on the motion on April 1, 2009; the parties cited only state case law and statutes.  *Id.* Ex. F.  The trial court ruled the evidence admissible.  *Id.* at 37-38.  As

indicated above, on direct appeal, counsel raised a point challenging the admission of this evidence (citing only state law); however, the First DCA affirmed the case.

To the extent this ground alleges a claim of state law error, specifically a state trial court evidentiary ruling, "federal habeas corpus relief does not lie for errors of state law." Lewis v. Jeffers, 497 U.S. 764, 780 (1990); see Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) (explaining that errors that do not infringe on defendant's constitutional rights provide no basis for federal habeas corpus relief). "A state's interpretation of its own laws or rules provides no basis for federal habeas corpus relief, since no question of a constitutional nature is involved." Carrizales v. Wainwright, 699 F.2d 1053, 1055 (11th Cir. 1983); accord, e.g., McCullough v. Singletary, 967 F.2d 530, 535 (11th Cir. 1992). "Indeed, the general rule is that a federal court will not review a trial court's actions with respect to the admission of evidence." Shaw v. Boney, 695 F.2d 528, 530 (11th Cir. 1983). "A state evidentiary violation in and of itself does not support habeas corpus relief" and "[b]efore such relief may be granted, the violation must rise to the level of a denial of 'fundamental fairness.'" Id.; see Jacobs v. Singletary, 952 F.2d 1282, 1296 (11th Cir. 1992) ("We review state court evidentiary rulings on a petition for habeas corpus to determine only 'whether the error, if any, was of such magnitude as to deny petitioner his right to a fair trial.' . . . Erroneously admitted evidence deprives a defendant of fundamental fairness only if it was a 'crucial, critical, highly significant factor' in the [defendant's] conviction." (citations omitted)); Link v. Tucker, 870 F. Supp. 2d 1309, 1324-30 (N.D. Fla. 2012) (district court order adopting magistrate judge's

report and recommendation to deny § 2254 petition alleging, among other things, state trial court abused its discretion by admitting evidence of petitioner's prior conduct).

A review of the record reflects that admission of the challenged evidence in this case does not appear erroneous under Florida state law. *See* Doc. 26 Ex. J at 10-13; § 90.404(2)(a), Fla. Stat. (2005); s*ee, e.g.*, <u>Durousseau v. State</u>, 55 So. 3d 543, 552 (Fla. 2010) ("[W]e hold that the collateral crime evidence did exhibit unique similarities that established a modus operandi sufficient for proving identity.  Pursuant to section 90.404(2)(a), evidence of other crimes, acts or wrongs is admissible to prove identity."); <u>Buenoano v. State</u>, 527 So. 2d 194, 197 (Fla. 1988) ("Under the <u>Williams</u> rule evidence of other crimes, wrongs and acts is admissible if it is relevant to and probative of a material issue even though the evidence may indicate the accused has committed other uncharged crimes or may otherwise reflect adversely upon the accused's character. Section 90.404(2)(a), Florida Statutes, (1983), codifies the ruling in <u>Williams v. State</u> and lists the purposes for which such evidence is deemed to be admissible: proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.").  Moreover, even if erroneous, such admission did not deprive Pelkey of a fundamentally fair trial, as the State presented substantial evidence of Pelkey's guilt through the including the victim's testimony and identification.

Finally, Pelkey has pointed to no U.S. Supreme Court precedent holding that the admission of this type of prior act evidence in these circumstances violates the federal constitutional guarantee of due process and a fair trial.  *See* <u>Link</u>, 870 F. Supp. 2d at 1328-29.  Therefore, he has not shown the state court's rejection of his claim, assuming

it was fairly presented, was contrary to or an unreasonable application of clearly established federal law.  *See id.*  This ground should be denied.

### <u>Ground 10</u>: Trial Court Erred in Striking Defense Witnesses

In his tenth ground, Pelkey asserts the state trial court erred by striking defense witnesses and preventing them from testifying.  Doc. 1 at 9.  As Respondent indicates, however, Pelkey did not present this ground in state court, at least as it concerns all five defense witnesses excluded by the trial court.  *See* Doc. 61-62.  Accordingly, except as to witness Scheri Martin, this ground is unexhausted and procedurally defaulted.

In particular, a review of the record confirms that Pelkey's initial brief filed in the direct appeal included a point involving the striking of defense witnesses, but challenging only the striking of Scheri Martin.  As to the remaining defense witnesses, therefore, the procedural default occurred in Petitioner's direct appeal.  In Florida, a claim of ineffective assistance of appellate counsel is properly presented in a petition for writ of habeas corpus filed in the state appellate court that decided the direct appeal.  *See* Fla. R. App. P. 9.141(d).  In this case, Pelkey evidently did not file such a petition.  Because Pelkey did not exhaust a claim of ineffective assistance of appellate counsel concerning counsel's failure to challenge the striking of defense witnesses (except for Scheri Martin), Pelkey is not entitled to federal review of his claim through the "cause and prejudice" exception or any other exception.

Moreover, the ground Pelkey raises here is different from the argument raised in the state appellate court concerning Scheri Martin.  Specifically, in the second point in his direct appeal, Pelkey asserted the trial court erred in not permitting Martin to testify

in support of the defense theory that the victim "mistook her reaction to nonsexual contact as a sexual violation."  Doc. 18 Ex. N at 18.  Pelkey argued there, "The testimony [of Scheri Martin] would have indirectly tended to establish reasonable doubt in the same manner that the collateral testimony of P.B. [the Williams Rule witness] indirectly contributed to proof of guilt."  *Id.* at 19; *see id.* at 21-22 (explaining that "Martin's testimony would have shown a lack of propensity and provided an innocent, alternative explanation of [the victim's] reaction during her massage by Pelkey which was consistent with Pelkey's testimony").  Pelkey further argued, without citation to any other authority, "This tendency to indirectly create reasonable doubt rendered the evidence admissible, and its exclusion reversible error in violation of Pelkey's right to present evidence under the Fifth Amendment and Fourteenth Amendment to the U.S. Constitution."  *Id.* at 21-22.  Notably, this is the only reference to any federal authority and, thus, Pelkey at least arguably did not fairly present a federal claim in state court.

Regardless, here, Pelkey raises a different argument that the one presented in his direct appeal.  Specifically, he argues in his § 2254 petition that the trial court erred by granting the State's motion to strike the five defense witnesses where the prosecutor had talked to only two of the five witnesses and where one defense witness was the first person to see the victim right after the incident:

> Trial court erred by striking defense witnesses from testifying.  State moved to strike defense witnesses from testifying on behalf of the defense, claiming that even though she (the prosecutor) had not talked to all of them, they could only offer testimony of the defendant's good character, further claiming that such testimony would be prejudicial against the State.  There were five (5) listed defense witnesses, yet the prosecutor, by her own admission, spoke with only two (2) defense

witnesses, yet moved the strike the testimony of all five (5) witnesses.
The trial court erred by granting the State's motion to strike defense
witnesses.  The court denied defendant assisting testimony on his behalf
through defense witness testimony.  One defense witness was also a
client of defendant and was present on the day of the alleged offense,
waiting in the waiting area for her appointment with the defendant.  This
witness was the first person to see the victim right after the alleged
incident, so this defense witness could have and would have offered
eyewitness testimony to the state of mind and emotional state of the
victim.  The victim carried on a brief conversation with defense witness
before leaving the defendant's place, and showed no signs that she had
just been sexually molested by the defendant.  On the contrary, the victim
exhibited natural behavior in conversing with defense witness and was
emotionally stable and presented no outward signs of distress.  This could
have been proffered to the jury through defense witness testimony had not
the trial court erred by striking testimony by all defense witnesses,
especially before the trial court knew to what the witnesses would testify.
This prejudiced the defendant and hindered him from presenting
testimonial evidence in his behalf.

Doc. 1 at 9.  Pelkey does not name the witness he describes as "the first person to see

the victim after the alleged incident."  As Respondent indicates, none of the five

witnesses so testified in proffer. Doc. 17 at 64; *see* Doc. 18 Ex. H at 71-74, 131-39.

Moreover, as explained in the analysis of Ground 9, *supra*, to the extent Pelkey alleges

a claim of state law error, specifically a state trial court evidentiary ruling, "federal

habeas corpus relief does not lie for errors of state law." Lewis, 497 U.S. at 780.

In his § 2254 petition, Pelkey did not allege cause and prejudice to excuse the

procedural default.  In his reply, Pelkey asserts he is "an innocent man convicted of an

act I did not commit." Doc. 19 at 1.  He acknowledges, however, at least implicitly, that

his case involved conflicting evidence, and the jury made a credibility determination.  To

the extent he argues the State did not present sufficient evidence to support his

conviction, such argument lacks merit.  *See* Doc. 18 Ex. H at 38-40, 52-53 (victim's trial

testimony); *see also* § 794.011(5), Fla. Stat. (2006).  This ground should be denied.

### Ground 11: Newly Discovered Constitutional Violation

In the addendum and second addendum to his reply, Petitioner Pelkey asserts a

new claim alleging that, in 2013, "while investigating the illegal actions taken by the

assigned, alleged prosecutor, Georgia Cappleman," he "quickly discovered that Ms.

Cappleman did not have an official Oath of Office for Assistant State Attorney on record

anywhere."  Doc. 20 at 1.  Pelkey argues that without such an official oath, Ms.

Cappleman did not have the legal authority to prosecute his case.  *Id.*; *see* Doc. 21.

Nothing indicates Pelkey raised this claim in a state court post-conviction

proceeding, nor did he raise it in his § 2254 petition.  He has raised it here for the first

time in his "Addendum to My Reply Brief," filed on or about May 1, 2014, almost 21

months after he filed his § 2254 petition and almost a year after Respondent's answer

and Petitioner's reply thereto.  Doc. 20; *see* Doc. 21 (Second Addendum to My Reply

Brief, filed on or about May 22, 2014); *see also* Doc. 1 (Pelkey's § 2254 petition, filed

August 9, 2012), Doc. 17 (Respondent's Answer, filed May 15, 2013), Doc. 19

(Petitioner's Reply Brief, filed June 17, 2013).  Therefore, this ground is not properly

before this Court and should not be considered.  *See, e.g.*, Tyler v. Mitchell, 416 F.3d

500, 504 (6th Cir. 2005) ("Because the penalty-phase insufficiency argument was first

presented in Tyler's traverse rather than in his habeas petition, it was not properly

before the district court, and the district court did not err in declining to address it.");

Thomas v. McDonough, 4:07cv473-MP/EMT, 2010 WL 3491156 at *5 (N.D. Fla. Sept.

2, 2010) (district judge order adopting report and recommendation that petitioner did not properly raise claim regarding lack of notary seal on probable cause affidavit supporting arrest warrant where petitioner raised claim for first time in reply brief filed after Respondent's answer); Klauer v. McNeil, No. 3:07cv541-LAC/EMT, 2009 WL 2399928 at *30 (N.D. Fla. July 31, 2009) (district judge order adopting report and recommendation that petitioner did not properly raise Brady claim in federal habeas proceeding where petitioner raised it for first time in reply to Respondent's answer, and petitioner could not amend petitioner "as a matter of course" because Respondent had already served answer, petitioner did not seek leave of court to amend petition, and reply expressly states intent that document be deemed reply to answer).

## Conclusion

Based on the foregoing, Petitioner James David Pelkey is not entitled to federal habeas relief.  The § 2254 petition (Doc. 1) should be denied.

## Certificate of Appealability

Rule 11(a) of the Rules Governing Section 2254 Cases in the United States District Courts provides that "[t]he district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant," and if a certificate is issued "the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."  Rule 11(b) provides that a timely notice of appeal must still be filed, even if the court issues a certificate of appealability.

Petitioner fails to make a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2); Slack v. McDaniel, 529 U.S. 473, 483-84 (2000)

(explaining substantial showing) (citation omitted).  Therefore, the Court should deny a certificate of appealability in its final order.

The second sentence of Rule 11(a) provides: "Before entering the final order, the court may direct the parties to submit arguments on whether a certificate should issue." The parties shall make any argument as to whether a certificate should issue by objections to this report and recommendation.

Leave to appeal in forma pauperis should also be denied.  *See* Fed. R. App. P. 24(a)(3)(A) (providing that before or after notice of appeal is filed, the court may certify appeal is not in good faith or party is not otherwise entitled to appeal in forma pauperis).

### Recommendation

It is therefore respectfully **RECOMMENDED** that the Court **DENY** Petitioner Pelkey's § 2254 petition (Doc. 1).  It is further **RECOMMENDED** that a certificate of appealability be **DENIED** and that leave to appeal in forma pauperis be **DENIED**.  The Clerk shall substitute Julie L. Jones as Respondent.

**IN CHAMBERS** at Tallahassee, Florida, on February 10, 2015.

S/  Charles A. Stampelos
**CHARLES A. STAMPELOS**
**UNITED STATES MAGISTRATE JUDGE**

### NOTICE TO THE PARTIES

**A party may file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**